# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| AMIN MOAWAD,<br><br>       Plaintiff,<br>v.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>       Defendant. | Civil Action No. 12-cv-1025 (PGS)<br><br>OPINION AND ORDER |

SHERIDAN, U.S.D.J.

  This matter is before the Court on the appeal of Plaintiff, Amin Moawad ("Plaintiff" or "Moawad") of the final decision of the Commissioner of Social Security Administration ("Commissioner") denying his request for disability insurance benefits for the period beginning August 27, 2003 through December 31, 2005, the date last insured (DLI) (hereinafter the "Time Period").

  ALJ Donna A. Krappa held two hearings on the matter. At the first hearing (September 30, 2009) Plaintiff testified; and at the second hearing (April 7, 2010) Martin Fechner, M.D., a medical expert, and Rocco Meola, a vocational expert, testified.

  On June 14, 2010, the ALJ issued a decision finding that Plaintiff was not disabled on or before December 31, 2005. ALJ Donna Krappa found that during the relevant period, Plaintiff had severe impairments due to a disorder of the back and exogenous obesity; however Plaintiff was "capable of the exertional demands of sedentary work" and therefore not disabled.

Background

  At the time of the ALJ's final decision, Plaintiff was 45 years old and was classified as a younger individual (20 C.F.R. § 404.1563). Plaintiff is a college graduate with past work experience as a controller/accountant. This experience included his job in sales management where he would "deal with

[a] number of reports to give to higher management." According to the vocational expert (Mr. Meola), Plaintiff's past work was classified as "sedentary" and due to his knowledge of accounting, it was considered "skilled" work. Long before the Time Period (1997) Moawad was involved in a motor vehicle accident. Moawad described the accident, and his injury as follows:

> I got rear ended into another truck in the front of me and I was under treatment for three years for, for a few months at least, until I tried to fight it but, apparently, it was not going any further. It got worse from sitting down and – all day in front of computers.

Evidently, Moawad's back pain arose from the 1997 accident. After the accident, Moawad had undertaken physical therapy and injections for the pain, but had rejected recommended surgery on several occasions because of his "obesity and . . . heart problems. " He did not want to "take the risk." According to Moawad, he takes 12 medications per day including Naproxen and Skelaxin for his back pain. In addition, Moawad's cardiologist has diagnosed him with heart disease and diabetes which are controlled by medication. At the hearing, Moawad indicated that during the Time Period, he was unable to perform any kind of work activity because his medications make him drowsy. Also, his back pain was so intense that from time to time, the pain required him "to lay down on my back flat until I find a comfortable spot" after which he could "get back to work."

Medical Reports and Records

**A.     Treating Physician Morin A. Dawoud, M.D**

Morin A. Dawoud, M.D. of Summit Medical Center has treated Plaintiff for neck and back pain. Moawad first saw Dr. Dawoud in June, 2001, and began regular monthly examinations by Dr. Dawoud in January, 2003.

According to the progress notes, complaints at each monthly follow-up visit were nearly identical. That is, Plaintiff complained of neck pain shooting to both arms, and back pain shooting to both of his legs with marked weakness, numbness, and tingling. He further complained of severe stiffness in the cervical and lumbar spine and an inability to sit or stand for more than thirty minutes, with tenderness of the cervical and paraspinal muscles bilaterally. Moawad also complained of limited range of motion in the spine. Dr. Dawoud found decreased sensation at the C3, C7, L4 and S2 nerve root distributions (more on the left side), and limitations when performing the straight leg raise test. In addition, Dr. Dawoud diagnosed bilateral cervical disc radiculopathy at C4-C5, lumbosacral disc herniation at L4, L5and S1, with bilateral radiculopathy. Dr. Dawoud's notes from 22 monthly visits each identify identical symptoms. (See R. 224, 225, 226, 227, 228, 229, 230, 231, 232, 302, 305, 306, 307, 308, 309, 310, 314, 315, 316, 317, 318, 319). When reviewing the 22 treatment records of Dr. Dawoud, the language in each varies only slightly, and there is no mention of any the objective diagnostic testing (MRIs) or other tests to support the findings. Since all 22 reports are virtually the same, they are more repetitive than comprehensive.

For illustration purposes, the text of three progress notes are set forth below to illustrate their similarity. These progress notes are from February 18, 2003, February 11, 2004, and December 9, 2005.

1. <u>Summit Medical Center Progress Notes</u>            Date: 2/18/03

**PATIENTS NAME**: Moawad, Amin
**CHIEF COMPLAINT**: *More neck pain shooting to both arms and increasing low back pain shooting to both legs with marked weakness, numbness and tingling sensation. Severe stiffness of C-spine and L-S spines. Unable to sit or stand for more than 15 minutes*
**VITAL SIGNS**: B.P. 140/85      T. 98.6      P: 80/min.      R. 19/min
**NECK**: *Increasing tenderness of the C/S and paraspinal muscles bilaterally, Marked stiffness & decreased ROM of the spine.*
**CHEST**: *Normal examination*
**HEART**: *Normal examination*

**ABDOMEN**: *Normal examination.*
**L/S SPINE**: *Markedly severe limitation of the spine. Tenderness of the lumbo-sacral spine and para spinal muscles bilaterally.*
**EXTREMETIES**: *Decreased sensation and motor power at the level of C3-C7 nerve roots distribution. Straight leg lifting elicits severe pain of the lumbosacral region at 55 degrees bilaterally, more so on the left side. Decreased sensation and motor power at the level of L4-S2 nerve roots distribution.*
**IMPRESSION**: *Bilateral Cervical disc radiculopathy at C4-C5. Lumbo-sacral discs herniation at L4-L5 and L5-S1 with bilateral radiculopathy.*
**TREATMENT**: *Continue same RX*
**PLAN**: *Continue RX*


2.      Summit Medical Center Progress Notes                    Date: 2/11/04

**PATIENTS NAME**:   Moawad, Amin
**CHIEF COMPLAINT**:    N*eck pain shooting to both arms and increasing low back pain shooting to both legs with marked weakness, numbness and tingling sensation. Severe stiffness of C-spine and L-S spines. Unable to sit or stand for more than 15 minutes. Spending most time on his back in a firm mattress.*
**VITAL SIGNS**:  B.P. 135/80               T. 98.6          P: 75/min.     R. 19/min
**NECK**:       *Increasing tenderness of the C/S and paraspinal muscles bilaterally, Marked stiffness & decreased ROM of the spine.*
**CHEST**:       *Normal examination*
**HEART**: *Normal examination*
**ABDOMEN**: *Normal examination.*
**L/S SPINE**: *Markedly severe limitation of the spine. Tenderness of the lumbo-sacral spine and para spinal muscles bilaterally.*
**EXTREMETIES**: *Decreased sensation and motor power at the level of C3-C7 nerve roots distribution. Straight leg lifting elicits severe pain of the lumbo-sacral region. Decreased sensation and motor power at the level of L4-S2 nerve roots distribution.*
**IMPRESSION**: *Bilateral Cervical disc radiculopathy at C4-C5. Lumbo-sacral discs herniation at L4-L5 and L5-S1 with bilateral radiculopathy.*
**TREATMENT**: *Continue same RX*
**PLAN**: *Continue RX*


3.      Summit Medical Center Progress Notes                     Date:  12/9/05

**PATIENTS NAME**:   Moawad, Amin
**CHIEF COMPLAINT**:    N*eck pain shooting to both arms with tingling and numbness all the way down to the fingers.    Lower back pain shooting to both legs with bilateral tingling and numbness.*
**VITAL SIGNS**:  B.P. 130/70              T. 98.6          P: 76/min.     R. 20/min
**NECK**:       T*enderness of the C/S and paraspinal muscles bilaterally, especially in the trapezius muscle region. .*

**CHEST**: *Normal examination*
**HEART**: *Normal examination*
**ABDOMEN**: *Normal examination.*
**L/S SPINE**: *. Tenderness of the lumbo-sacral spine and para spinal muscles bilaterally. Severe limitation of the spine.*
**EXTREMETIES**: *Decreased sensation and motor power at the level of C3-C7 nerve roots distribution. Straight leg lifting elicits severe pain of the lumbo-sacral region. Decreased sensation and motor power at the level of L4-S2 nerve roots distribution.*
**IMPRESSION**: *Bilateral Cervical disc radiculopathy at C4-C5. Lumbo-sacral discs herniation at L4-L5 and L5-S1 with bilateral radiculopathy.*
**TREATMENT**: *Continue same RX*
**PLAN**: *Continue RX*

Comparing each report above (sections chief complaint, neck, L/S spine, extremities and impression), they are all the exactly the same. The progress notes do not discuss any course of action or treatment to be undertaken, e.g, any heat treatments, or physical therapy, nor the results of diagnostic tests. In addition to the progress notes, Dr. Dawoud also completed a number of Physician's Statement of Disability for Plaintiff's Long Term Disability Carrier (Physician Statement). In one such statement, Dr. Dawoud stated that Plaintiff would "never" be released back to work, because his condition was a Class 5 in severity (indicating severe limitations in functional capacity, and incapable of even minimal (sedentary) work activity. Dr. Dawoud rated Plaintiff to be 75-100% disabled within each of his Physician Statements. However, in the section captioned "medical evidence that substantiates or contributed to Plaintiffs inability to work" Dr. Dawoud responded generally "limited range of motion of the spine; straight leg raise positive at 25 degrees on the right; and 45 degrees on the left" rather than referring to the results of any objective diagnostic tests.

In addition to the Physician Statements, on August 13, 2002 Dr. Dawoud submitted a letter to letter to Guardian Group Claims regarding Plaintiff's long term disability. He opined that it was impossible for Plaintiff to stand or sit down for more than a period of fifteen to thirty minutes, after which Moawad must

lay flat on his back for more than one hour on firm orthopedic mattress; and walking causes him severe intolerable back pains that oblige him to stop in less than one block's distance. Dr. Dawoud opined that surgery is not "totally suitable at his present condition" because Plaintiff was obese weighing above 255 pounds, and dieting had failed. Moreover, Plaintiff "has been urged to go for neuro-surgical intervention of his disc problems, but [refused] and was afraid to go for surgery." Dr. Dawoud writes that his opinion was "based on MRIs of the lumbar and cervical spine, positive straight leg raising on both the right and left and repeated observations of severe limitation of motion . . ." It is uncertain when the MRI tests occurred, but they do not appear to have occurred within the Time Period.

Diagnostic Testing

Plaintiff has the burden of proof of showing he was disabled during the Time Period in question. At the April 7, 2010 hearing the medical expert, Dr. Fechner, testified that the best way to determine Moawad's impairments at that time is to evaluate the diagnostic testing that occurred as near in time to the Time Period. Dr. Fechner found that two records were most relevant. They were the records of September 19, 2005 and February 20, 2007.

The September 19, 2005 MRI of the cervical spine revealed an "interval appearance of posterior subligamentous disc herniation's, C4-C5 and C5-C6 without cord contact or foraminal impingement." (R. 329). On this same date, an "MRI of the lumbar revealed a [p]osterior central disc herniation L5-S 1 with ventral thecal sac compression without central canal or foraminal stenosis."

On February 20, 2007, an x-ray of cervical spine revealed no evidence of a fracture or misalignment, disc spaces were maintained, and atlantoaxial relationship was undisturbed. According to Dr. Fechner, the impression was of a normal cervical spine. (R. 234).

Consultative Examinations and Residual Functional Capacity Assessment

Plaintiff was examined by Francky Merlin, M.D. on February 23, 2007 for a consultative medical examination. At the time of the examination, Plaintiff was a well-developed, obese male who was alert, conscious, oriented and in no acute distress. He was casually dressed and his affect and behavior were appropriate. The musculoskeletal examination revealed that Plaintiff walked with an antalgic gait, had difficulty rising up from a chair and from an examining table. He had full use of both hands and arms in dressing and undressing. Grasping strength and manipulative functions were not impaired. He was able to flex the spine forward 0-60 degrees and partially squat, but was unable to walk on his heels and toes. There was tenderness in the neck. Rotation of the neck right was 0-75 degrees, left was 0-60 degrees, flexion 0-50 and extension 0-30 degrees. Tenderness was elicited in the lumbar spine, but there was no paravertebral hypertonicity. Neurologically, he was alert, conscious and oriented. Straight leg raise was 0-45 degrees bilaterally. The diagnosis was polyarthralgia and he was advised to follow up with an orthopedist. Dr. Merlin found that Plaintiff could sit, stand, walk, handle objects, hear, speak and travel, but he should not lift or carry heavy objects or be exposed to dust, fumes or extremes in temperature.

On the Residual Functional Capacity dated April 20, 2007, Plaintiffs limitations were as follows: Occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk (with normal breaks) for a total of at least 2 hours in an 8 hour work day; sit (with normal breaks) for a total of about 6 hours in a 8 hour work day; push and/or pull (including operation of hand and/or foot controls) were unlimited; with no postural, handing or fingering limitations, and no manipulative limitations. There were no visual, communicative, or environmental limitations.

The Administrative Law Judge's Decision

On June 14, 2010, the ALJ found that during the Time Period, Plaintiff had severe impairments including disorder of the back, and exogenous obesity, but he was nevertheless "capable of the exertional demands of sedentary work" and therefore not disabled. The ALJ gave several reasons for her decision.

First, Moawad did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Appendix 1 during the Time Period. More specifically, the ALJ found that no medical source has suggested that the severity of Plaintiff's impairments either met or equaled the listings, either singly or in combination. The ALJ relied on Dr. Fechner testimony that there was no "objective clinical or laboratory evidence of nerve root compression, spinal arachnoiditis or lumbar spinal stenosis" as required for a finding of disability under listings 1.02, 1.03 or 1.04 (Musculoskelatal Impairments). Dr. Fechner further testified that the results of the February 23, 2007 examination by Dr. Merlin found that Plaintiff's sensory examination and deep tendon reflexes were normal, and that Plaintiff's grasping and manipulative functions were not impaired. With regard to Plaintiff's obesity, Dr. Fechner found that at 5'9" and 275 pounds, Plaintiff suffered from "exogenous obesity" or "moderate" obesity. As such, Moawad has some restrictions. Dr. Fechner found:

> He would have been restricted but could have done a full range of sedentary activity. He could certainly lift 10 pounds occasional, and walk and stand an aggregate of two hours in an eight hour day. Sit six hours in an eight hour day. Every hour he could, perhaps would need to, get up and stretch for a minute or two. The only other thing that would be contradicted is the use of ladders or crawling in low places.

The ALJ also based her decision on Dr. Merlin's report from February, 2007. The ALJ summarized the report:

> Notably, in a report dated February, 2007, the consultative examiner, Dr. Merlin reported that the claimant had full use of both hands and arms in dressing and undressing. Dr. Merlin noted that the claimant's grasping strength and manipulative functions were not impaired and, he had no motor or sensory deficits. It was further reported that the claimant had full strength in the lower extremities, and that there was no evidence of muscle atrophy; and that the claimant had no sensory or reflex abnormalities.

The ALJ concluded that during the Time Period, Plaintiff had been capable of the exertional demands of sedentary work. In addition, the ALJ adopted the findings of the residual functioning capacity assessment which showed that Plaintiff could undertake sedentary work activity.

Second, the ALJ found Moawad's subjective complaints were not consistent with the objective medical findings. For example, although Plaintiff's MRIs showed some herniation, the diagnostic tests did not reveal impairments that would result in a finding of disability based on the musculoskeletal system impairment listings (20 CFR part 404, Subpart P, Appendix 1).

The ALJ wrote:

> Having carefully considered the claimant's statements, along with the record evidence as a whole, pursuant to Social Security (SSR) 96-7p, I find the claimant's statements concerning his impairments and their impact on his ability to work are not entirely credible in light of the discrepancies between the claimant's assertions and information contained in the documentary reports, the reports of treating and examining practitioners, the claimant's medical history as reported by Dr. Fechner, and the findings made during the claimant's physical examinations.
>
> In my judgment the claimant's complaints are essentially subjective and without substantial medical foundation; the limitations he alleges are far in excess of those which would reasonably be consistent with objective medical evidence. Furthermore, the claimant's complaints are not consistent with other evidence. Having carefully considered these factors, I conclude that the claimants' complaints of disability symptoms are not reasonably accepted.

Moreover, the ALJ discredited the reports of Dr. Dawoud as lacking credibility. The ALJ stated:

> No significant weight is accorded to the assessment of inability to work by Dr. Dawoud as it is primarily based upon the claimant's subjective complaints of pain and not on objective medical evidence. Furthermore, I find that the doctor's assessment is not supported by the record as a whole.

Legal Standard

A claimant is considered disabled under the Social Security Act if he is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). A plaintiff will not be considered disabled unless he cannot perform his previous work and is unable, in light of his age, education, and work experience, to engage in any other form of substantial gainful activity existing in the national economy. 42 U.S.C. § 423(d)(2)(A). *See Sykes v. Apfel*, 228 F.3d. 259, 262 (3d Cir. 2000); *Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 118 (3d Cir. 2000); *Plummer v. Apfel*, 186 F.3d 422, 427 (3d Cir. 1999). The Act requires an individualized determination of each plaintiff's disability based on evidence adduced at a hearing. *Sykes*, 228 F.3d at 262 (citing *Heckler v. Campbell*, 461 U.S. 458, 467 (1983)); *see* 42 U.S.C. § 405(b).

Review of the Commissioner's final decision is limited to determining whether the findings and decision are supported by substantial evidence in the record. 42 U.S.C. § 405(g). *See Morales v. Apfel*, 225 F.3d 310, 316 (3d Cir. 2000); *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999). *Doak*, 790 F.2d 26 at 28. Substantial evidence has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Hartranft,* 181 F.3d at 360 (quoting *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (citation omitted)); *see also Richardson v. Perales*, 402 U.S. 389, 401 (1971). Substantial evidence is less than a preponderance of the evidence, but more than a mere scintilla.

*Richardson*, 402 U.S. at 401; *Morales*, 225 F.3d at 316; *Plummer*, 186 F.3d at 422. Likewise, the ALJ's decision is not supported by substantial evidence where there is "competent evidence" to support the alternative and the ALJ does not "explicitly explain all the evidence" or "adequately explain his reasons for rejecting or discrediting competent evidence." *Sykes*, 228 F.3d at 266 n.9.

The reviewing court must view the evidence in its totality. *Daring v. Heckler*, 727 F.2d 64, 70 (3d Cir. 1984).

> A single piece of evidence will not satisfy the substantiality test if the [Commissioner] ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence – particularly certain types of evidence (e.g., that offered by treating physicians) - - or if it really constitutes not evidence but mere conclusion.

*Morales*, 225 F.3d at 316 (citing *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir.1983)); *see also Benton v. Bowen*, 820 F.2d 85, 88 (3d Cir. 1987). Nevertheless, the district court's review is deferential to the ALJ's factual determinations. *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992) (en banc) (stating district court is not "empowered to weigh the evidence or substitute its conclusions for those of the factfinder"). A reviewing court will not set a Commissioner's decision aside even if it "would have decided the factual inquiry differently." *Hartranft*, 181 F.3d at 360. But despite the deference due the Commissioner, "appellate courts retain a responsibility to scrutinize the entire record and to reverse or remand if the [Commissioner]'s decision is not supported by substantial evidence." *Morales*, 225 F.3d at 316 (quoting *Smith v. Califano*, 637 F.2d 968, 970 (3d Cir. 1981)).

Title II of the Social Security Act, 42 U.S.C. § 401, *et seq*. requires that the claimant provide objective medical evidence to substantiate and prove his or her claim of disability. *See* 20 CFR § 404.1529. Therefore, claimant must prove that his or her impairment is medically determinable and

cannot be deemed disabled merely by subjective complaints such as pain. A claimant's symptoms "such as pain, fatigue, shortness of breath, weakness, or nervousness, will not be found to affect . . . .[one's] ability to do basic work activities unless 'medical signs' or laboratory findings show that a medically determinable impairment(s) is present." 20 C.F.R. §404.1529(b); *Hartranft*, 181 F.3d at 362. In *Hartranft*, claimant's argument that the ALJ failed to consider his subjective findings were rejected where the ALJ made findings that claimant's claims of pain and other subjective symptoms were not consistent with the objective medical records found in the record or the claimant's own hearing testimony.

Discussion

Plaintiff's primary argument is that the ALJ relied upon the testimony of Dr. Fechner who utilized the results of the September 2005 MRI and the February 2007 report of Dr. Merlin, while giving little weight to the reports and opinions of Dr. Dawoud.

As a general rule, "[t]reating physician's reports should be accorded great weight, especially when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time.""" *Plummer*, 186 F.3d at 429 . However, a treating physician's opinion may be rejected on the basis of contradictory medical evidence, or may be accorded less weight depending upon the extent to which a supporting explanation is provided for the opinion. Dr. Dawoud opines that Plaintiff is unable to do any type of work, but this finding is reserved for the Commissioner who weighs different factors. The law is clear that the opinion of a treating physician does not bind the ALJ on the issue of functional capacity. *Brown v. Astrue*, 649 F.3d 193, 196 n.2 (3d Cir. 2011). Despite Dr. Dawoud's opinion, the ALJ found that Moawad was capable of the exertional demands of sedentary work. See, 20 C.F.R. § 404.1527(d)(3).

Here, the ALJ gave greater weight to the objective diagnostic evidence than to the subjective complaints and evidence on which Dr. Dawoud relied. Such authority is vested with the trier of fact as the ALJ weighs contradictory evidence. Moreover, the reliability of Dr. Dawoud's report were discredited based on discrepancies between the objective findings and Plaintiff's subjective complaints, as well as the repetitiveness of his monthly progress reports. Most importantly, the ALJ did not totally ignore Dr. Dawoud's reports, the ALJ simply found the objective testing to be more reasonable to rely on.

In addition, the ALJ found Moawad to be incredulous due to his characterization of his pain when compared to the objective evidence. The ALJ has discretion to evaluate the credibility of Plaintiff's complaints and draw a conclusion based upon medical findings and other available information. *Jenkins v. Commissioner*, 2006 U.S. App. Lexis 21295 (3d Cir. 2006). Credibility determinations are the unique province of a fact finder. *See generally Dardovitch v. Haltzman,* 190 F.3d 125 (3d Cir. 1999) (internal quotation omitted). Inasmuch as the ALJ had the opportunity to observe the demeanor and determine the credibility of Plaintiff, the ALJ's observations on these matters must be given great weight. *See Wier v. Heckler*, 734 F. 2d 955, 962 (3d Cir. 1984). *See also*, Social Security Ruling 96-7, 20 C.F.R. 404.1529 and 20 C.F.R. 416.969.

In conclusion, substantial evidence supports the ALJ's decision that Plaintiff was not disabled during the Time Period.

ORDER

This matter having come before the Court upon the appeal of Plaintiff Amin Moawad from the Commissioner of Social Security Administration's final decision denying his application for Disability Insurance Benefits; and the Court having considered all submissions of the parties; and in light of the reasons stated above;

It is on this 27th day of June, 2013,

ORDERED that the final decision of the Commissioner of Social Security is affirmed.

*s/Peter G. Sheridan*
PETER G. SHERIDAN, U.S.D.J.